IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL** |
| | ) | |
| v. | ) | Case No.: 1:20-MJ-312-JFA |
| | ) | |
| MATTHEW ERAUSQUIN, | ) | |
| | ) | |
| a/k/a MATT HAMMOND, | ) | |
| | ) | |
| Defendant. | ) | |

## **AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Christopher Rekas, being first duly sworn, hereby depose and state as follows:

### **INTRODUCTION AND AGENT BACKGROUND**

1.     Your Affiant has been employed as a Fairfax County Police Officer for more than

fourteen (14) years in a patrol and investigative capacity. Your Affiant is currently assigned to

the Major Crimes Bureau Child Exploitation and Missing's Persons Unit and is a Task Force

Officer with the FBI Washington Field Office Child Exploitation and Human Trafficking

Taskforce. Your Affiant has authored and participated in several search warrants that have led to

arrests and convictions in the Circuit and General District Courts of Fairfax County, Virginia.

Your Affiant has received formal training from the Fairfax County Criminal Justice Academy.

While a Task Force Officer, Your Affiant has assisted in the investigation of federal criminal

violations related to commercial sex trafficking, missing persons, child exploitation, and child

pornography.  I have gained experience in these violations by conducting investigations into

1

commercial sex trafficking, sexual exploitation of children, the distribution and receipt of child pornography, adult sex crimes, child abuse and sex crimes and have conducted undercover investigations in narcotic and vice operations. Moreover, I am a federal task force law enforcement officer authorized by the Attorney General to enforce violations of the laws of the United States including but not limited to, Title 18, United States Code, Sections 1591, 2251, 2252, 2252A, 2422 and 2423. I have a Bachelor of Art in Social and Behavior Science. As a federal task force agent, I am authorized to execute warrants issued under the authority of the United States.

2.     I am submitting this affidavit in support of a criminal complaint and arrest warrant charging the defendant MATTHEW ERAUSQUIN a/k/a MATT HAMMOND with Sex Trafficking of Children, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(2), and (c).

3.     The statements contained in this Affidavit are based on my experience and background as a criminal investigator, on information provided to me by other members of the Federal Bureau of Investigation, Fairfax County Police Department, other law enforcement officers, court records and documents, business records, interviews, publicly available information and my review of physical and documentary evidence. I have personally participated in the investigation of the offenses set forth below and, as a result of my participation and review of evidence gathered in the case, I am familiar with the facts and circumstances of this investigation. Since this Affidavit is being submitted for the limited purpose of supporting a criminal complaint, I have not included every fact resulting from the investigation. I have set forth only the facts that I believe are necessary to establish probable

cause to believe the above-named defendant has violated Title 18, United States Code, Sections 1591(a)(1), (b)(2), and (c), as set forth herein.

## RELEVANT FEDERAL CRIMINAL STATUTES

4.     18 U.S.C. § 1591 prohibits the sex trafficking of children.  In relevant part, Section 1591 prohibits a person, in or affecting interstate commerce, from knowingly recruiting, enticing, harboring, transporting, obtaining, maintaining, patronizing or soliciting a person under the age of 18 years old, having had a reasonable opportunity to observe the individual, or knowing or in reckless disregard of the fact that the individual was under the age of 18 years old, and knowing and in reckless disregard that the person would be caused to engage in a commercial sex act.

5.     Pursuant to 18 U.S.C. § 1591(e)(3), the term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person.

6.     18 U.S.C. § 2421 prohibits a person from knowingly transporting any individual in interstate or foreign commerce with the intent that such individual engage in prostitution.

## STATEMENT OF PROBABLE CAUSE

7.     As described more fully herein, Fairfax County Police and the FBI have been investigating ERAUSQUIN's involvement in paying multiple minor girls for sex.  The minor girls went to three different area high schools located in the Eastern District of Virginia.  ERAUSQUIN continued paying several of the females for sex after they turned 18 years old.  Based on victim interviews and documentary evidence obtained during this investigation, the victims include the

following individuals, including (a) their age; (b) the month/year when the commercial sexual exploitation began; and (c) the high school they attended:

(1) Victim J, age 16, June 2017, attended High School H;

(2) Victim G, age 16, June 2017, attended High School H;

(3) Victim S, age 16, July 2017, attended High School W;

(4) Victim GB, age 16, August 2017, attended High School W;

(5) Victim I, age 16, April 2019, attended High School W; and

(6) Victim E, age 17, September 2019, attended High School S.

### Law Enforcement Receives Initial Information From Student K Regarding Commercial Sexual Exploitation

8.      In May 2019, a 17-year old high school student named "K" provided information to Fairfax County Police regarding an adult male in his 40s paying multiple high school girls for sex (hereafter "Student K."). Student K provided information involving Victim I, Victim GB, Victim J, and Victim S, among others.

9.      According to Student K, she was a classmate and friend of Victim I. According to Student K, Victim I disclosed to her that an adult male in his 40s (later identified as MATTHEW ERAUSQUIN) paid $1000 to engage in threesome sexual activity with Victim I and Victim GB. Victim I also disclosed to Student K that she received a Tiffany's bag from ERAUSQUIN.

10.     Student K further informed Fairfax County Police that Victim I disclosed contracting a sexually transmitted virus and was unsure if she contracted the virus from ERAUSQUIN. Student K indicated that Victim I had a mental breakdown and was currently being hospitalized.

11. Student K also reported that Victim GB told others she had a "sugar daddy." Student K reported that Victim GB's "sugar daddy" (later identified as ERAUSQUIN) bought GB an expensive camera and provided her with weed. Victim GB did not tell Student K what ERAUSQUIN did for a living but stated he was "rich and powerful."

12. Student K also informed law enforcement of other girls she believed were being paid for sex by ERAUSQUIN, including but not limited to, Victim J and Victim S.

## Interviews of Victims

13. As part of the investigation, law enforcement identified and interviewed Victim J, Victim G, Victim GB, Victim S, Victim I, and Victim E, among others. Law enforcement met with each individually on multiple occasions. During initial interviews, several victims were hesitant to disclose various things that happened, and at times, denied and/or refused to disclose information.

14. In conjunction with interviewing victims, law enforcement also executed search warrants and served subpoenas on numerous companies, including, but not limited to, Snapchat, Facebook, Instagram, Tinder, Uber, Paypal/Venmo and various phone companies.

## Commercial Sexual Exploitation of Victim J and Victim G

15. Through interviews with Victim J and Victim G, law enforcement learned that Victim J first met ERAUSQUIN when she was 16 years old on the website SeekingArrangement.com, a website where "Sugar Daddies" can find "Sugar Babies."

16. Victim J represented on her online profile that she was 18. The site required people to state they were 18 or over in order to create a profile. Victim J used actual pictures of herself on the site.

17. According to Victim J, ERAUSQUIN asked her for a video of her sucking on something and offered her $200 dollars for the video. Victim J stated that she recorded a video of her sucking on a toothpaste bottle and that ERAUSQUIN paid her $200 dollars via PayPal/Venmo.

18. The first time Victim J met up with ERAUSQUIN she was 16 years old. She also brought her 16 year old friend, Victim G.

19. Prior to meeting up with ERAUSQUIN, Victim J sent a photograph to him of Victim G over Snapchat. ERAUSQUIN was aware another girl would be coming and he was happy about it. Victim J recalled that his Snapchat name had something to do with "panther."

20. ERAUSQUIN obtained an uber to transport both Victim J and Victim G to a shopping center in Arlington, Virginia. The three of them went to a restaurant for a sit down lunch.

21. According to Victim G, they were nervous because they were underage and they were worried ERAUSQUIIN would notice. Victim G stated they had a prearranged plan to discuss college related things to make them seem older. ERAUSQUIN did not ask them a lot of questions about their personal life.

22. At the conclusion of lunch, ERAUSQUIN paid for the meal. After lunch, the three of them went to his apartment.

23. Once at ERAUSQUIN's apartment, they talked for a bit while standing in his kitchen. The three went into his bedroom and he engaged in threesome sexual activity with Victim J and Victim G, which included him engaging in sexual intercourse and/or oral sex being performed on him.

24. After the sexual activity, ERAUSQUIN provided individual cash payments to Victim J and Victim G. Victim J recalled receiving $800. Victim G recalled receiving $700. He also obtained an Uber ride for them to leave his place.

25. Victim J and Victim G both estimated being at ERAUSQUIN's place together between six to seven times when they were minors. He paid for sexual activity each time. Victim J reported they were each paid $800 per visit. Victim G reported they were each paid $700 to $900 per visit.

26. Victim J and Victim G reported getting to ERAUSQUIN's apartment through various means, including Uber rides that he ordered for them to share and/or transporting themselves through other means.

27. Victim J and Victim G both reported routinely taking the elevator to get to his apartment upon arrival and exiting through the stairwell when leaving.

28. Both girls reported receiving edible marijuana from ERAUSQUIN in the form of chocolate bar edibles. Victim G also reported that ERAUSQUIN gave her a Sephora gift card that he had originally purchased for a female he had previously been dating.

29. In July, 2018, when Victim G was 17 years old, she moved outside of the 48 contiguous states after the completion of her junior year. In the meantime, ERAUSQUIN continued to pay Victim J for sex (along with other high school girls discussed in the next section below).

30. In December 2018, Victim J and Victim G were both 18 years old and seniors in high school. Victim G was interested in flying back to Virginia to visit family for the holidays. Victim J asked ERAUSQUIN to fly Victim G back to Virginia for the holidays. ERAUSQUIN agreed to fly Victim G back.

31.     In order to purchase the airline ticket, ERAUSQUIN asked for Victim G's date of birth.

32.     Victim G provided her actual date of birth, which at that point made her 18 years old.

33.     Victim G reported that ERAUSQUIN did not express any anger or shock when she informed him of her actual date of birth.

34.     Victim J also reported that she made a comment to ERAUSQUIN about their age around the time of ERAUSQUIN purchasing the plane ticket for Victim G. ERAUSQUIN indicated to Victim J that he kind of knew their ages the entire time and liked it.

35.     Victim G reported that ERAUSQUIN was only going to purchase her a one-way plane ticket to Virginia. He was then going to buy her return flight after she got to Virginia. Victim G reported she thought he was holding off on the return trip purchase to make sure she would visit him while she was in Virginia. After Victim G explained that her family would not let her visit unless she had a roundtrip ticket, he ultimately purchased a return trip ticket as well.

36.     After Victim G arrived in Virginia, she did not go to see ERAUSQUIN initially. Victim J and Victim G reported that ERAUSQUIN threatened to cancel her return flight because she had not visited him.

37.     After learning of the threat, Victim G went to ERAUSQUIN's apartment. ERAUSQUIN engaged in sexual intercourse with her. Thereafter, ERAUSQUIN provided her with several hundred dollars cash and placed the money in a Chanel gift card envelope for her.

38.     Victim G also informed your Affiant that after leaving Virginia, ERAUSQUIN eventually paid her for nude photographs of herself. She also stated ERAUSQUIN randomly sent her $50 for Valentine's Day.

39.     During the investigation, legal process was submitted to Uber Technologies, Inc. for subscriber information and trip receipts between the vicinity of ERAUSQUIN's apartment located at 2700 Clarendon Boulevard, Arlington, Virginia and the victims' residences. The subscriber information revealed that ERAUSQUIN's Uber account was linked to the email account merausquin@yahoo.com. A review of the Uber records from ERAUSQUIN's account showed multiple Uber car rides sent directly to Victim J's home address (when she was still a minor) to then be transported to the vicinity of 2700 Clarendon Boulevard on the following dates: June 16, 2017; September 1, 2017; September 19, 2017; and August 10, 2018.

40.     Law enforcement obtained the cell phones belonging to Victim J and Victim G. Your Affiant reviewed the PayPal/Venmo transactions recovered from Victim J's phone. Victim J informed your Affiant that she had received PayPal/Venmo payment from ERAUSQUIN but that the name associated with the PayPal/Venmo account was MATT HAMMOND. Your Affiant was able to take a screen shot of the account which displayed the name MATT HAMMOND as well as a profile photograph of the individual associated with the MATT HAMMOND account. Your Affiant recognized the profile picture associated with the MATT HAMMOND PayPal/ Venmo account as the same individual Your Affiant knows to be MATTHEW ERAUSQUIN.

41.     Your Affiant recovered two PayPal/Venmo transactions from MATT HAMMOND on Victim J's phone. One transaction was dated June 15, 2017 for $200.00 and a second transaction was dated August 7, 2019 for $500.00.

42.     As noted above, Victim J had previously disclosed that when she was 16 years old, she recorded a video of herself sucking on a toothpaste bottle and that ERAUSQUIN paid

her $200.00 dollars via PayPal/Venmo for that video.

43.     On October 15, 2019, legal process was submitted to PayPal/Venmo for the account information and transactions associated with MATT HAMMOND. PayPal/Venmo complied with that process. After reviewing the records, your Affiant learned that the phone number associated with the account was 305-898-3522 and that the address associated with the account was 50 South Pointe Drive, Miami Beach, Florida. Based on AT&T phone subscriber records and other materials previously obtained in this investigation, AT&T records under the name MATTHEW ERAUSQUIN tie him to 305-898-3522 and 703-568-3110, along with the email address Matt@clalegal.com. The AT&T records further provide two addresses tied to him: 2700 Clarendon Blvd, Apt E210, Arlington VA 22201 and 100 S. Pointe Dr, Miami, Beach, Florida 33139.

44.     Your Affiant also located numerous photographs of Victim J and Victim G relevant to the investigation, including when they were 16 years old. Both girls have young faces, and Victim G in particular is very petite. In one photo dated June 19, 2017, Victim G is seen laying down over several hundred dollars cash with a hand sign. Victim J and Victim G informed Your Affiant that the money was obtained from ERAUSQUIN.

45.     When reviewing messages on Victim J's and Victim G's phone, law enforcement obtained a screenshot of the initial one-way, first class airline ticket that ERAUSQUIN purchased for Victim G to fly her from outside the 48 contiguous states to Ronald Reagan airport (DCA). The flight was booked to land in Virginia on December 23, 2018.

46.     Your Affiant also located typed messages relevant to the investigation on the phones of Victim J and Victim G. For example, Victim G told Victim J:

**Victim G (12/16/2018):** I gave him my real bday he said he didn't wanna do the math.

....

**Victim G (12/18/2018):** omg  he's getting my ticket back rn.  he said he's very excited to see us.  he just sent me a picture of a lot of money and he said 'I went to the bank to stock up.'

47.     Your affiant also located messages between ERAUSQUIN and Victim J where he threatened to cancel Victim G's flight back after Victim G did not initially visit him.  For example, your Affiant found the following exchange:

**+13058983522 Matt** (1/1/2019): I'm canceling the flight back, so you'll get a lot more time to hang out with her.  Done with this

**Victim J** (1/1/2019): I'm sorry but she's been ignoring me too

**+13058983522 Matt** (1/1/2019): not your fault, just letting you know what to tell her when she shows up at the airport expecting to get on her next $1500 first class flight with foot massages or whatever tf and she can't go

**Victim J** (1/1/2019): I think she's just been busy.  She's free tomorrow I believe

**+13058983522 Matt** (1/1/2019): I understand busy but it takes 5 seconds to respond. I can do anytime after 12

....

**+13058983522 Matt** (1/2/2019): Ok I'll just cancel the flight and at least get a little of my money back

**Victim J** (1/2/2019): You can do whatever you want to do but personally I think it's a little irrational.  She told me that you unadded her on snap.  At least give her a heads up before you do it bc I'm not sure how else she can get home

48.     In subsequent messages, ERAUSQUIN informed Victim J that Victim G came over, stating in part:

11

+13058983522 **Matt** (1/2/2019): she came over I feel bad for her. She looks like she is having a rough time of it. She told me that she's not doing anything but pot. And I guess I believe her. But I'm not sure that being up there is healthy for her

**Victim J** (1/2/2019): No I know for a fact that she only smokes and sometimes she drinks. She's a lot better mentally up there. Her family down here just drives her crazy.

+13058983522 **Matt** (1/2/2019): I know she was saying that. I will literally get her a place here. Even in leesburg or warrenton if she wants to be more in the country. You can live with her if you want. I can give you guys "jobs" to explain your income, direct deposit, etc. She's such a cool girl, but seems so much different now

49.     As noted above, Victim G informed your Affiant that after leaving Virginia, ERAUSQUIN eventually paid her for nude photographs of herself. She also stated ERAUSQUIN randomly sent her $50 for Valentine's Day. A review of Victim G's phone revealed a payment from MATT HAMMOND for $250 on May 10, 2019, along with a payment for $50 on February 14, 2020.

### Commercial Sexual Exploitation of Victim S and Victim GB

50.     During the course of the investigation, multiple eye witnesses discussed the commercial sexual exploitation of Victim S and Victim GB. For example, during interviews with Victim J and Victim G, both girls informed your Affiant of a time when ERAUSQUIN engaged in commercial sex with three underage girls during the same visit. Specifically, he engaged in commercial sex with Victim J, Victim G, and Victim S.

51.     Victim J explained that she, Victim S, and Victim G had become close friends. Victim S asked where Victims J and G were getting their money from. Victim J told Victim S about ERAUSQUIN. Victim J reported sending a photo of Victim S to ERAUSQUIN and stated he had no issues with Victim S joining them.

12

52.     Victim J, Victim G, and Victim S drove together over to ERAUSQUIN's apartment. Victim J and Victim G informed your Affiant that ERAUSQUIN engaged in sexual intercourse with all three girls. Both Victim J and Victim G recalled ERAUSQUIN penetrating Victim S vaginally while Victim S was laying on her stomach. ERAUSQUIN was being rough with her and Victim S looked uncomfortable. Victim J and Victim G reported that ERAUSQUIN paid each girl cash, with Victim J recalling $800 and Victim G recalling it was $600 or $700 cash.

53.     During interviews with Victim S, she affirmed going to ERAUSQUIN's residence with Victim J and Victim G and stated she was having a hard time financially. She was 16 years old. Victim S was informed that ERAUSQUIN had previously paid Victim G and Victim J $800 when they were at his residence. When the three girls arrived at ERAUSQUIN's place, Victim S reported that ERAUSQUIN met the three of them downstairs in his building and walked them up to his apartment unit. She reported staying pretty quiet while ERAUSQUIN, Victim J, and Victim G chatted.

54.     Victim S further reported that foursome sexual activity occurred while she, Victim J, and Victim G were in ERAUSQUIN's bedroom, however, Victim S denied that ERAUSQUIN engaged in vaginal sexual intercourse with her. She reported ERAUSQUIN engaged in vaginal sexual intercourse with Victim J and Victim G in her presence. She further reported ERAUSQUIN directed Victim S to touch and kiss the breasts of Victim J and Victim G. She also reported engaging in oral sex with ERAUSQUIN but could not recall if it was during the visit with Victim J and Victim G or during a subsequent visit with Victim GB (discussed *infra*).

55.     Victim S further reported that ERAUSQUIN gave each girl an envelope containing money after the foursome sexual activity. Victim S reported receiving within her envelope $800 cash, in $100 denominations. After Victim S's first visit at ERAUSQUIN's residence, Victim J provided Victim S with ERAUSQUIN's Snapchat account.

56.     The investigation has revealed evidence that thereafter, Victim S and Victim GB were ubered to ERAUSQUIN's residence for commercial sexual activity when both girls were 16 years old.

57.     During interviews with Victim GB and Victim S, both disclosed that Victim GB learned about ERAUSQUIN through Victim S. Victim S informed your Affiant that Victim S needed money and she informed Victim GB she previously did something while with ERAUSQUIN she was "not proud of" and got a lot of money for it. After talking to Victim GB about it, Victim S communicated with ERAUSQUIN and a date and time were set up for Victim S and Victim GB to go over to his place together.

58.     During interviews with Victim GB, she reported ERAUSQUIN sent an uber to Victim GB's residence to transport Victim S and Victim GB together to his residence. Victim GB noted they represented they were 18 years old but said it was "obvious" they were not 18. Victim GB reported having silver bracketed orthodontic braces on her top and bottom teeth during this first visit. She also reported ERAUSQUIN seemed to know a lot about her during the first visit, including her first and last name, and he stated he knew Victim GB's father. Victim GB further reported she expected ERAUSQUIN to be much younger and was surprised by how old ERAUSQUIN appeared when she first met him.

59.     During the first visit, Victim GB reported they talked for about twenty minutes before the three of them headed into his bedroom. Victim GB reported that ERAUSQUIN

engaged in sexual intercourse with both her and Victim S. Victim GB also reported that ERAUSQUIN had Victim S perform oral sex on him. She believed ERAUSQUIN also requested that Victim GB and Victim S kiss each other. After the sexual activity, ERAUSQUIN gave both Victim GB and Victim S envelopes that each contained $800 cash. Thereafter, ERAUSQUIN ordered them an uber to take them to Tyson's Corner mall. While at the mall, Victim GB and Victim S purchased shoes, clothing, and jeans.

60.     Victim S reported that after ERAUSQUIN transported Victim S and Victim GB to his place, the three of them engaged in sexual activity in his bedroom. Victim S denied that vaginal sexual intercourse occurred between ERAUSAUIN and herself. Victim S reported that ERAUSQUIN engaged in sexual intercourse with Victim GB in her presence. Victim S also reported that ERAUSQUIN asked Victim S and Victim GB to kiss and touch each other while he watched. Victim S reported that ERAUSQUIN provided each of them $800 cash in envelopes and noted that Victim GB was "over the moon" with the amount of money he paid both of them. Thereafter, Victim S and Victim GB informed ERAUSQUIN they had to leave because Victim GB's father was going to pick them up at the mall. ERAUSQUIN ubered them to the mall.

61.     Both Victim GB and Victim S reported that Victim GB had a cold sore near her mouth during GB's first visit. Both Victim GB and Victim S reported that ERAUSQUIN offered Victim GB a pill to take to treat the cold sore.

62.     Victim S also reported ERAUSQUIN talking about his travels, a private airplane he had, and how he made money at casinos. Victim S further reported him providing her a corona to drink after the sexual activity. Moreover, she reported ERAUSQUIN showing them a vacuum sealed package of marijuana.

63.    Victim S further stated that she and ERAUSQUIN communicated over Snapchat. Victim S would tell him how school was going. She reported telling him over Snapchat her real age and reported that ERAUSQUIN did not care or mind. Victim S reported receiving a Snapchat message from him while she was in class showing him laying naked in bed and asking her what she was wearing. She reported it started to get weird when ERAUSQUIN sent her snaps while she was in class and her classmates could see that this older male was sending her snaps. Victim S said she eventually blocked him.

64.    Victim GB informed your Affiant that Victim GB wanted to get more money from ERAUSQUIN while she was underage without engaging in sexual activity with him. Victim GB, while also communicating with Victim S, sought more money from ERAUSQUIN and informed him if he did not give her money she would go to the police because she was underage. ERAUSQUIN told Victim GB that she and Victim S would be the ones to get in trouble and stated he could sue her. Victim GB reported she and Victim S were so young and did not know the law so they believed ERAUSQUIN when he said that they would be the ones to get in trouble. Thereafter, Victim GB and ERAUSQUIN did not communicate or see each other in person again until Victim GB was a senior in high school.

65.    Victim J reported her knowledge of the threats that Victim GB and/or Victim S made against ERAUSQUIN through statements ERAUSQUIIN made to her. According to Victim J, ERAUSQUIN told her it would be stupid for them to try to extort him because having sex with a minor was not that big of a deal compared to extortion. Victim J further reported that ERAUSQUIN told Victim J that he was confident that Victim J would never do something like that. After the threat ERAUSQUIN received from Victim GB and/or Victim S, he continued to

pay both Victim J and Victim G for sex while they were both underage (prior to Victim G

moving outside the 48 contiguous states).

## Evidence Corroborating the Commercial
## Sexual Exploitation of Victim S and Victim GB

66.     A review of photographs obtained through the investigation reveal a photograph

of Victim J, Victim G, and Victim S together in a bathroom.  Victim S is wearing a sleeveless

top and blue jeans.  Victim J informed your Affiant the photo was taken the same day the three

of them were at ERAUSQUIN's residence.  Your Affiant also recovered a photograph of Victim

S wearing the same sleeveless top and blue jeans while holding several hundred dollars in her

hand with a photo caption stating "Selfie Saturday 7.22.17."

67.     A review of phone records from AT&T reveal eight phone contacts between

Victim S's phone number and ERAUSQUIN (305-898-3522) dated July 23, 2017, along with a

phone contact on August 20, 2017, and a phone contact on November 6, 2017.

68.     In an interview with law enforcement, Victim GB identified a picture of herself

from her Snapchat account dated August 4, 2017.  Victim GB informed law enforcement she

remembered this picture being taken the same day she and Victim S went to ERAUSQUIN's

residence for commercial sex.  She was 16 years old and going into her junior year of high

school.

69.     A review of the Uber records from ERAUSQUIN's account showed an Uber sent

directly to Victim GB's home address on August 4, 2017 to then be transported to 2700

Clarendon Boulevard, Arlington, Virginia.  The trip duration to ERAUSQUIN's place was from

2:10 pm to 2:41 pm.  The Uber records from ERAUSQUIN's account also shows a trip dated

August 4, 2017 from 2700 Clarendon Boulevard to 8025 Tysons Corner, Tysons VA.  The trip

duration was from 3:54 pm to 4:12 pm.

70.     Your Affiant recovered photographs of Victim GB and Victim S during the relevant time frame when they were 16 years old, with both girls appearing young and petite. Additionally, your Affiant located pictures of Victim GB with silver bracketed braces on her teeth. Dental records obtained through the investigation reveal that Victim GB had the orthodontic braces on from May 21, 2014 until October 9, 2017.

## Continued Commercial Sexual Exploitation of Victim J and Victim GB After They Turned 18

71.     Victim J informed your Affiant that ERAUSQUIN continued to pay Victim J for commercial sex after Victim J turned 18 and was a senior in high school. Victim J also informed your Affiant that ERAUSQUIN preferred to engage in threesome sexual activity and encouraged her to bring friends over for such purposes.

72.     According to both Victim J and Victim GB, Victim J and Victim GB knew each other previously and reconnected with each other when both girls were in high school and 18 years old. Victim J and Victim GB both went to ERAUSQUIN's residence. ERAUSQUIN paid both girls for threesome sexual activity on multiple occasions when they were seniors in high school and 18 years old. He paid both girls $500 each. At times, ERAUSQUIN also had each girl over individually and paid them money in exchange for sexual activity.

73.     According to Victim GB, ERAUSQUIN indicated to her that he knew she was previously underage.

74.     According to Victim J, she talked to ERAUSQUIN about lacrosse practices after school when she was a senior in high school.

75.     During the investigation, your Affiant located a video Victim J sent to ERAUSQUIN at his panther410 Snapchat account showing multiple girls running in a gymnasium while holding lacrosse sticks. One of the girls is wearing a "High School H"

sweatshirt. Additionally, the video shows some lettering on the gymnasium floor with the first three letters of "High School H" visible. The video was sent by Victim J to ERAUSQUIN on March 21, 2019.

76.     Both Victim J and Victim GB reported to your Affiant that ERAUSQUIN offered to take both girls on vacations on his private plane. Victim GB also said he bought her a Leica camera that cost several thousand dollars. Both girls reported receiving purses from Tiffany's from him.

77.     Your Affiant obtained records from the Leica Store in Washington DC showing a purchase made under ERAUSQUIN's name with a VISA credit card in the amount of $7,828.10 on March 12, 2019.

78.     Your affiant also located multiple financial transactions indicating payment from ERAUSQUIN to Victim J through various credit cards and money transfer applications. For example, a review of records from a Citibank account ending in 4247 in the name of ERAUSQUIN'S employer, Consumer Litigation Associates, shows a $250 DEBIT-MONEYSEND to Victim J on May 7, 2019. A review of Hushmail records tied to ERAUSQUIN show a $500 transaction from his personal Citibank account ending in 4808 to Victim J dated August 7, 2019.

79.     A review of Hushmail records tied to ERAUSQUIN show that on May 23, 2019 ERAUSQUIN sent Victim GB a $1000 instant transfer from his personal Citibank account ending in 4808.

### Commercial Sexual Exploitation of Victim I

80.     Victim I informed your Affiant that when she was a junior in high school and 16 years old, she became friends with Victim GB, who was then a senior and 18 years old. Victim I

19

noticed that Victim GB had a lot of money and was buying a number of things. Victim GB told Victim I about ERAUSQUIN.

81.     Victim I reported going to ERAUSQUIN's residence on two separate occasions with Victim GB. Victim I was a junior in high school and 16 years old both times. She believed it was in April 2019. Victim I recalled being ubered from Victim GB's residence to ERAUSQUIN's residence.

82.     The first time Victim I was at ERAUSQUIN's place with Victim GB, she reported ERAUSQUIN giving her a glass of wine and she drank it while talking with ERAUSQUIN and Victim GB in the kitchen area of his apartment. After approximately twenty minutes, the three of them were in ERAUSQUIN's bedroom and he engaged in sexual intercourse with both her and Victim GB. Afterwards, he paid them $500 each in denominations of $100 bills.

83.     The second time Victim I and Victim GB were at ERAUSQUIN's residence, Victim I reported he again engaged in sexual intercourse with both girls and paid money.

84.     Victim I recalled that during one of the times she was at his apartment, ERAUSAQUIN had multiple boxes at his residence containing purses from Tiffany's. He instructed both Victim I and Victim GB to pick out a box. Both girls received a Tiffany's purse.

85.     Victim I also recalled during one of the times she was at his apartment, ERAUSQUIN provided both girls marijuana that they consumed at his place.

86.     Victim I also recalled ERAUSQUIN driving Victim I and Victim GB to the mall and dropped them off after sexual activity. Victim I reported that ERAUSQUIN kept his vehicle parked under the apartment building where he lived and recalled that he drove a Range Rover.

87. After ERAUSQUIN dropped off Victim I and Victim GB at the mall, Victim I ultimately passed out. She was then taken to a hospital via an ambulance.

88. Victim GB provided your Affiant similar information relating to ERAUSQUIN and VICTIM I. Victim GB informed your Affiant that ERAUSQUIN engaged in threesome sexual activity with her and Victim I, which included him engaging in vaginal sexual intercourse with both girls, provided them money, and gave them Tiffany purses. Victim GB also discussed going to the mall with Victim I after one of the visits at ERAUSQUIN's residence where Victim I was then taken to the hospital via an ambulance.

89. Victim GB and Victim I both reported taking the elevator to get to his apartment upon arrival and exiting through the stairwell when leaving during their visits at his place.

### Evidence Corroborating the Commercial Sexual Exploitation of Victim I and Others

90. During the investigation, your Affiant reviewed messages exchanged between Victim GB and Victim I located on Victim I's cell phone.

91. On April 2, 2019, Victim GB sent a message to Victim I stating, "Matt wants to know if ur free next week like mon/tues."

92. By messages dated April 9, 2019, your Affiant located the following exchange between Victim I and Victim GB:

> **Victim I**: What time are we going?
>
> **Victim GB**: like 5 …he would uber us from my house…come over after school
>
> **Victim GB**: Ur 18 today ok
>
> **Victim GB**: u got held back when u were younger so ur just old for ur grade
>
> **Victim I**: yea makes sense lol….I can just say im a senior

**Victim GB**: He follows my insta so he could probs see ur bio so I just told him ur old for a junior

….

**Victim GB**: I told him u were nervous he said we could smoke a lil w him before

….

**Victim I**: why would u tell him I'm nervous

**Victim GB**: He asked me …Bc [another victim JS] was really really nervous last time and it was really awkward

….

**Victim I**: can we drink before

**Victim GB**: yessir…I don't have alc but he probs does

93.　A review of the Uber records tied to ERAUSQUIN's account shows that on April 9, 2019, an uber was ordered from his account to go to the home address of Victim GB to the vicinity of ERAUSQUIN's residence at 8300 N Edgewood Street, Arlington VA. On that same date, a return trip was ordered from ERAUSQUIN's account for a trip from 2700 Clarendon Blvd, Arlington VA to the home address of Victim GB.

94.　Additionally, a review of messages between Victim GB and Victim I dated April 10, 2019 stated, in part, the following:

**Victim GB**: And sugar daddybsaid [sic] we could see him Friday so I was thinking we could go early as possible and then go to Tysons and I can buy props there for the shoot

**Victim I**: yess let's do that….tysons will be open late cause it's a Friday…bet and we can get our Tiffany stuff

**Victim GB**: omg yes

**Victim I**: are you seeing him today too

**Victim GB**: yes lmao

**Victim I**: you're bouta be rich

**Victim GB**: Makin 1.5k this week holy fuck

**Victim I**: save some

95.    The Uber records tied to ERAUSQUIN's account shows that on (Friday) April 12, 2019, an uber was ordered from his account to go to the home address of Victim GB to 2700 Clarendon Blvd in Arlington, Virginia. The uber trip duration was from 2:10 pm to 2:44 pm. No return uber trip is indicated in the records.

96.    A review of a photograph date stamped April 12, 2019, showed Victim I eating a taco. Victim I and Victim GB informed your affiant that the photograph was taken at the mall after being at ERAUSQUIN's residence. A photograph time stamped April 12, 2019, shows Victim I in a hospital room laying on a gurney with a male attendant and various computer monitors behind her. Both Victim I and Victim GB informed your Affiant this picture was taken after Victim I was transported to the hospital after collapsing at the mall.

97.    In a post dated April 12, 2019, your Affiant located a photograph Victim GB posted on SnapChat, stating "Bruh sugar daddy got me a tiffany bag". The photograph contains a white Tiffany's purse that was later recovered from Victim GB by your Affiant.

98.    A review of financial records tied to ERAUSQUIN show that on March 15, 2019 ERAUSQUIN made a purchase at TIFFANY AND CO in the amount of $20,831.41 from his personal Citibank account ending in 4808.

99.    A review of additional messages dated May 18, 2019, revealed Victim GB telling Victim I the following:

And I got tested by the way I don't have it so idk where u got it from but I haven't told anyone. I'm so sorry ab everything tho I actually feel terrible for letting u ever do that.

Get well

100. A review of messages between ERAUSQUIN and Victim J revealed a

conversation about sexually transmitted diseases dated May 22 and May 29, 2019 stating:

> **Victim J** (5/22/2019): I wanted to let you know that one of [Victim GB's] friends that she brought to hang out with you has herpes. I wasn't aware that you and [Victim GB] were meeting with someone else and it honestly feels like a breach of trust and the fact that there is a possibility of me having the disease justifies my displeasure with the situation. I thought it would be a good idea for you to know in case [Victim GB] hasn't told you because she's not the most honest person I've met. With this I think it would be wise to end our arrangement here. I appreciate your generosity and the time we've spent together.

> **+13058983522 Matt** (5/22/2019): she told me, but it has nothing to do with me, I get full tests done every 3 months everything is good. here is my latest one.

> **+13058983522 Matt** (5/22/2019): [medical lab results attached]

> **+13058983522 Matt** (5/22/2019): I didn't see an issue with [Victim GB] bringing other people, and have tried to make sure I took care of you even when we hadn't seen each other. But I understand your position, and I'm glad we got a chance to get to know each other

> **+13058983522 Matt** (5/22/2019): Also I had messaged [Victim G] a couple of times the last couple days to see if the 3 of us could hang when she gets back in town, but she hasn't read my snaps yet. I'll let that drop going forward as well. I didn't want you to think I had messaged her after this. You're the first one I met, and the most important. Sorry to see this end, but I'll have some amazing memories to take with me. So thanks for that.

> **+13058983522 Matt** (5/29/2019): and still fine. Everything is clear. [medical lab results attached]

101.    Messages between ERAUSQUIN and Victim J revealed more conversations about threesomes in July 2019 and included references to Victim S, Victim G, and Victim GB. For example, messages revealed in part:

> **Victim J** (7/30/19): Hey there
>
> **Victim J** (7/30/19): It's been a while : )
>
> **+13058983522 Matt** (7/30/2019): hey have you been ok?  Was thinking about you the other day
>
> ….
>
> **Victim J** (7/30/19): I've been thinking about you too tbh
>
> **+13058983522 Matt** (7/30/2019): are you thinking about wanting to set something up again?
>
> **Victim J** (7/30/19): Yeah, I was if that's okay with you?
>
> **+13058983522 Matt** (7/30/2019): definitely, what are you thinking?
>
> **Victim J** (7/30/2019): That we could hangout sometime this week.
>
> **Victim J** (7/30/2019): idk if you'd want me to bring someone with me but if not it can just be me too
>
> **+13058983522 Matt** (7/30/2019): I'm down, who were you thinking of bringing
>
> **Victim J** (7/30/2019): I was going to suggest [Jane Doe] bc [Victim GB] has a bf now
>
> **Victim J** (7/30/2019): But ok that she's not your type so it's totally cool if you'd prefer me to come by myself
>
> **+13058983522 Matt** (7/30/2019): [Jane Doe] is our only option?
>
> **Victim J** (7/31/2019): Yeah, idk anyone else who'd be down
>
> **Victim J** (7/31/2019): Unless you're willing to look past the dodgy history with [Victim S]

**+13058983522 Matt** (7/31/2019): yeah no interest for me there. lmk if you come across someone normal, more like a [Victim G] type

**Victim J** (7/31/2019): I really don't know anyone else. Would you want to meet just us?

**+13058983522 Matt** (7/31/2019): tbh I really prefer threesomes. I can do the one on one thing in normal dating

**+13058983522 Matt** (7/31/2019): I do this to be a little edgier

**Victim J** (7/31/2019): Oh I see

**Victim J** (7/31/2019): Hmmm ok I'll see what I can do

**+13058983522 Matt** (7/31/2019): thanks, have a lot of good memories with you and [Victim G], it's a shame she's gone. Cool girl

....

**+13058983522 Matt** (7/31/2019): …maybe we can find someone else from the site, or meet another couple

102.    On July 31, 2019, Victim J forwarded to ERAUSQUIN a message she received

from Victim GB.  The forwarded message to ERAUSQUIN stated in part:

**Victim GB:** U know he's being investigated right?

**Victim GB**: So just be careful

**Victim J:** Investigated for what?

**Victim GB**: For money fraud and apparently something about having sex w underage girls

**Victim GB**: Bc one of the girls I knew who went to him was 17 and she told her parents ….The police came to my house about it like a month ago but I didn't talk to them

103.    After receiving the forwarded message, ERAUSQUIN responded in part:

+13058983522 **Matt** (7/31/2019): yeah this is the first I'm hearing about the [Victim GB] thing. Everything was cool, even bought her a super nice camera and then suddenly disappeared and blocked me on everything. Didn't understand it but figured she got a bf

+13058983522 **Matt** (7/31/2019): she brought over one girl but told me she was a senior and was 18

...

+13058983522 **Matt** (8/5/2019): none of this is worth risking my career for. I have parents in their late 70s that are relying on me to take care of them

## Commercial Sexual Exploitation of Victim E
### Beginning in September 2019

104.    During the investigation, your Affiant uncovered sexual photographs of a young girl in ERAUSQUIN's panther410 snapchat account. The photographs showed her vagina and breasts and were date stamped September 8, 2019.

105.    Through analysis of the snapchat account user name and subsequent interviews, your Affiant learned the photographs were of Victim E, age 17 years old.

106.    Victim E stated she met ERAUSQUIN over the dating application Tinder.com. She said he was posing as a teenage male about 18 on his Tinder profile with a name different than Matt. Victim E provided her age as 18 on Tinder and noted that is the minimum age that must be inserted to create an account on Tinder.

107.    Victim E reported that she and ERAUSQUIN switched over to talking over Snapchat and ERAUSQUIN told her that his first name was Matt. ERAUSQUIN told her that he used a different name for protection because Tinder was sketchy.

108.    Victim E stated that ERAUSQUIN paid her $100 via PayPal/Venmo "out of the blue" just for saying hello and she believed that he was showing off that he had money. The

payment from ERAUSQUIN came from the PayPal/Venmo account MATT HAMMOND. Victim E informed Your Affiant that ERAUSQUIN paid her a second time in the amount of $200.00 dollars.

109.     Prior to meeting ERAUSQUIN in person, Victim E recalled telling ERAUSQUIN she was a senior in high school and told him the specific school she attended (i.e., "High School S").

110.     She recalled being at ERAUSQUIN's apartment on multiple occasions, and recalled that on one occasion he picked her up near her school, on another occasion he sent an uber to pick her up near her school, and on one occasion she drove herself.

111.     Victim E recalled the first time she met ERAUSQUIN in person. She thought they were going to meet up and smoke marijuana. She recalled meeting him near a Soul Cycle and went up to his apartment. He gave her a tour of his apartment. She recalled he had a pet cat. When he showed her the bedroom, he stated "this is always the most awkward part," then threw her on the bed and engaged in sexual intercourse with her while she lay on her stomach and penetrated her from behind. He did not wear a condom. Afterwards he paid money in bills of $100 denominations.

112.     According to Victim E, after the first visit, ERAUSQUIN started asking Victim E to bring a friend with her to his place. He stated they would both receive $1000 if she brought a friend.

113.     Victim E recalled ERAUSQUIN sending an Uber to her school on one occasion. She left her car parked at the school and took the Uber to his residence. While at his residence, he took a hit off of a THC dab rig in her presence. He told her it was not laced. She took a hit of the dab ring and passed out thereafter. She did not remember what happened next but woke up in

ERAUSQUIN's bed with no clothes on. ERAUSQUIN paid her money again. He ordered an uber to take her back to her car parked at the school.

114.    Victim E recalled during another visit that ERAUSQUIN pulled up his laptop to watch other people having sex at the same time that ERAUSQUIN engaged in sexual activity with her. ERAUSQUIN was flipping through different channels on a website trying to find a couple that would suit his preferences and Victim E's preferences. Victim E believed the laptop was still open and running so others could view what was happening while ERAUSQUIN engaged in sexual activity with her. She recalled ERAUSQUIN eventually putting the computer away and then engaged in sexual intercourse with Victim E while she laid on her stomach.

115.    Victim E also noted that ERAUSQUIN wanted her to buy thigh high stockings and to wear them. Victim E bought thigh high stockings with money he gave her and brought them to his residence. ERAUSQUIN instructed her to go to the bathroom and to wear nothing but the thigh high stockings. Victim E reported coming out of the bathroom with a t-shirt on and the thigh high stockings. She reported that ERAUSQUIN got frustrated and was aggressive with penetrating her. He engaged in sexual intercourse with her twice while she wore the stockings. She believed he paid her $500.

116.    Victim E reported that ERAUSQUIN informed her that he was regularly tested for STDs and did not use condoms with her.

117.    Victim E further reported that during one of her visits, ERAUSQUIN showed her a duffel bag containing various types of drugs, including marijuana, THC wax, THC cartridges and psilocybin mushroom (a/k/a "Shrooms") that were in capsule form. She said ERAUSQUIN would also offer her alcohol. She believed he got some of the drugs from California because he talked about "CaliCarts", which your Affiant knows to be THC cartridges.

118.   Victim E reported that each time she went to his residence, she rode the elevator up to his apartment. To exit his place, he had her take the stairs.

119.   Victim E reported that ERAUSQUIN offered to buy her a first class ticket to visit South Carolina for the weekend. Victim E told ERAUSQUIN she was already visiting South Carolina with her parents. ERAUSQUIN indicated that she could sneak away from her strict parents.

120.   Victim E reported a time when she was in Yearbook class at school when ERAUSQUIN wanted her to send pictures of herself. She noted it was "Chapel Day" at her school and she was wearing a dress. She went into the girls' bathroom, took pictures of herself, and sent the pictures to him.

### Evidence Corroborating the Commercial Sexual Exploitation of Victim E

121.   A review of PayPal/Venmo records obtained during this investigation revealed a payment of $100 and a payment of $200 from MATT HAMMOND to Victim E's PayPal/Venmo account on September 8, 2019, the same day as the nude time stamped photographs of Victim E located in the panther410 Snapchat account.

122.   While reviewing the communications between panther410 and Victim E, on September 17, 2019, panther410 provided Victim E with the address to his apartment, 2700 Clarendon Boulevard, and gave her instructions on where to park. On September 18, 2019, panther410 informed Victim E he would be open to a long-term relationship where Victim E would bring another girl. ERAUSQUIN also told Victim E that he really liked threesomes.

123.   Victim E noted when ERAUSQUIN picked her up to go to his place, she noted he was driving an almost black Range Rover SUV. A review of the panther410 SnapChat return

shows a message from panther410 to Victim E dated September 8, 2019 stating, "cool I have 2019 range dark gray."

124.    Additionally, a review of Uber records tied to ERAUSQUIN shows a trip dated September 11, 2019 from "High School S" to Erausquin's apartment located at 2700 Clarendon Boulevard, Arlington Virginia. The uber records from ERAUSQUIN's account show the actual name of High School S, along with the address.

125.    Your affiant located a photograph on Victim E's phone from Victim E's SnapChat account date stamped September 11, 2019, showing a hand holding several $100 bills. Victim E identified the $100 bills as money that she received from ERAUSQUIN. A review of photographs of Victim E and viewing Victim E in person reveals that she is very petite and looks young.

126.    Additionaly, a review of the panther410 SnapChat return shows a communication dated September 17, 2019 from panther410 to Victim E stating, "2700 Clarendon Blvd. or just GPS to the apple store. You either park in the loop near the apple store[,] on the street anywhere[,] or in the garage underneath the building by Pottery Barn."

127.    Your Affiant also looked through Victim E phone contacts on her phone and found the number 305-898-3522 saved on her phone under the name "Mayaaaaaaaaa." As discussed herein, this is a number tied to ERAUSQUIN through AT&T records and other sources.

## CONCLUSION

128.    Based on the foregoing, and on my training, experience and participation in this and other investigations, I submit there is probable cause to believe that between in or about July, 2017 through September, 2019, in the Eastern District of Virginia, MATTHEW ERAUSQUIN,

a/k/a MATT HAMMOND sex trafficked Victims J, G, S, GB, I, and E in violation of Title 18, United States Code, Sections 1591(a)(1), 1591(b)(2), and 1591(c).

Christopher Rekas
Detective
Fairfax County Police Department

Respectfully submitted and attested to
in accordance with the requirements of
Fed. R. Crim. P. 4.1 via telephone on
November 16, 2020

John F.
Anderson

Digitally signed by John
F. Anderson
Date: 2020.11.16 11:37:01
-05'00'

Hon. John F. Anderson
United States Magistrate Judge
Alexandria, Virginia